13-1173 USA v. Rajesh Rawal 13-1182 USA v. Kamal Acharya 13-1215 USA v. Viral Thakkar 13-1216 USA v. Lokesh Tyal 30 minutes to be shared by the defendants and 30 minutes for the plaintiffs Mr. Greenlee, Mr. Loren, Mr. Rogal, Mr. Simmons, and Mr. Gerwitz for the appellants and Mr. Loren will start to detail Good morning, you did good on the names Good morning Judge Boggs, Judge Strauss, Judge Pohl The three Title III issues that we raise in the brief are all interlinked and they go to the fundamental question of judicial supervision of wiretapping which lies at the heart of the statutory scheme in Title III The factual underpinnings of the claims are set forth in mind-numbing detail I was reminded when I looked back at the brief this morning in the brief, and my time here barely allows me to say my name, much less talk about the details but let me, if I can, skip through some of the high points of each of the arguments as I understand them First, as to the necessity issue This was, and I can't emphasize this too much This was, as the affidavit in support of the first application for wiretapping authority demonstrated this had been an extremely successful conventional investigation They had the agents in the person of both controlled sources I'm sorry, confidential sources and sworn agents had managed to, according to the affidavit infiltrate the very core of this enormous undertaking that they proposed to investigate with wiretapping There was no reason to believe that further conventional surveillance I'm sorry, conventional investigative techniques would not have only allowed the agents to infiltrate further and more broadly and indeed, as it turned out Didn't the affidavit indicate that several of those common techniques had reached a natural ending? One of the gentlemen was suspected and was no longer one of the confidential informants was suspected supposedly and no longer a part, no longer called or participated and the trash drawers had been caught What common technique do you think was still available that had not adequately run its course? There was a CS2, there was an informant who was still in contact with the subjects of the investigation and indeed, as the further affidavits show, the subsequent affidavits show continued to work with the subjects of the investigation Two, the agents had managed to introduce some of the subjects of the investigation according to the affidavit to an FBI agent operating in the guise of a doctor It is true that the affiant reported that one or another of the people with whom the doctor had been in contact and the supposed patients who were also agents had been suspected because either they didn't have an office or they were non-white, or they were all white folks But there's nothing in the affidavit that suggests that given everything else the government was up to they couldn't have supplied the doctor with an office or they couldn't have supplied non-white agents Whatever failings that the infiltration had had had suffered at that point, as I read the affidavit at least was simply a factor of the agents not adapting to the changing circumstances not because of anything inherent about the circumstances of the investigation or of the investigative techniques available to the agents More importantly perhaps, the premise for the electronic surveillance request was that electronic surveillance would be necessary to identify all of the participants, all of the activities yet I don't see anything in the affidavit that would suggest to the judicial officer reviewing the application any information that would lead to the conclusion that wiretapping would itself identify all of the participants or all of the activities And if all that were required for a showing of necessity were the showing that there are people whom we haven't identified yet then the necessity requirement would be effectively read out of existence That's at least the way I read it Now I understand that perhaps the necessity requirement like so much of the rest of Title III has been given short shrift I'm sorry, the clock is distracting me I think it's incredible that according to the wiretap the administrative office wiretap report in 10 years only 7 of 24,000 applications for wiretap authority were rejected by the courts to whom the applications were made To me that suggests that maybe the judges out there on the district level aren't doing their job but that doesn't mean that this court shouldn't I have one question just to appeal against your time you'll still get your minute for rebuttal This is a case of what I call cascading wiretaps You get a wiretap, you get more information that more information helps you get more information which helps you get the next wiretap Is that of any relevance here in the sense that all of your arguments pretty much go against each of the wiretaps Is there any reason to say one of them is worse than another or that if you're fundamentally right about wiretap 1 does that kill everything below it or conversely do you have some argument about wiretap 4 even if you lost with wiretap 1 or is it just one ball of wax All of the above I think that this wiretapping was flawed from the inception and the defects as to the first order which is the predicate upon which the subsequent orders were entered would infect everything that followed At the same time, I can't necessarily draw the line at extension 3 or extension 4 or extension 5 but I just note that extension 7 we had 199 days of wiretapping in this case which is an extraordinary lengthy period of wiretapping for what is really in the final extension the same claim of necessity is made that is that wiretapping is only now beginning to give us an insight into the full scope of the endeavor Well, when can this ever stop? Okay, I get that. Thank you. Thank you, Counselor. You'll have your minute for rebuttal. Good morning, Your Honors, and may it please the Court. My name is Andrew Greenlee and I'm here on behalf of Babu Bhatt Patel. Your Honors, this is a difficult case. We have a sprawling, multi-defendant, multi-million dollar health care fraud conspiracy and yet we're asking this Court to reverse. On the other hand, the wiretap that was obtained and used by the government raises serious, serious concerns. Now, I probably can't improve on what Mr. LeBrun said regarding necessity but I would like to point out that every single one of the attorney-client calls were captured and recorded. There was no contemporaneous minimization and all of these calls were accessible to anyone with the Red Wolf login. Now, we believe that that violates both the spirit and the letter of Title III and equally important, we believe that it violates the terms of the order authorizing the wiretap. Counsel, with respect to the part that you just said about anybody with access to the Red Wolf system could get these, do you have any evidence or even any belief that anyone other than the, quote, taint team did access them? Your Honor, we'll never know. The whole investigation was shrouded in secrecy. There was no evidence that anyone accessed them. There's simply no pro or con. No, but the very fact that it was possible. They were on the system. I thought that they had some types of control in terms of access, the passwords or something of that sort. Am I wrong? I think that's right. I think that case agents had the... No, it wasn't just their word that they didn't do it, but there's evidence that they would have had to do something in terms of either getting passwords or something of that sort. Well, I'm not sure that that's quite right. I think that anyone who, all the case agents could log into the Red Wolf system and whether they were trying to get attorney-client calls, get access to those or get access to any other calls and the government can obviously correct me if I'm wrong. We'll talk about the system that when they downloaded the disks and did various things that the attorney-client calls did not go on the same disks as the others. That much is right. But my understanding, at least, is that the case agents had access to the Red Wolf. We'll ask them. In any event, look, as difficult as that decision is to reverse on this case, which is so big and so sprawling and required so much resources on the part of the government to prosecute, we think that it's an easy decision with respect to the sentencing issues that were raised in our brief. We know that Rule 32 requires a district court to rule on any disputed matter at sentencing. And we know that under United States v. White, this court reads Rule 32 literally. That is, the district court has to, in the words of White, actually find facts. Now, if this court examines the ruling of the district court, it did exactly what White prohibits, and that is it summarily adopted the government's position with respect to a hotly disputed issue of fact during the course of sentencing. And we believe that White requires reversal here. The government, their position is essentially that, well, the district court adopted the arguments that we made in court, but that's exactly what the same could be said about the White decision. What about the Simmons case, which post-states both Rita and White? What's your view on Simmons? My view is that it doesn't impact the fundamental holding of the White decision, and that is that the court has to find facts, and the court didn't do that here, and we're not asking this court to set Mr. Patel free, at least on this point. We're just asking the court to reverse and remand for just in terms of what facts it should have found. The fundamental fact here was what was the amount of loss. The pre-sentence report simply said plus 20 on the points.  Fundamentally, the government, in its memorandum and orally, said 100% of the VDA, 25% of everything else. Your side attacked various of it. He said, I've heard both sides. Perhaps he should have said, and I find that it's 100% of the VDA and 25% of the non-VDA, but how would that have added anything if he had put it in those words, and could you have attacked those words? We absolutely could have. What more facts would he have had to say then? He could have said, and if he had said, I find as a matter of fact that 100% of the VDA transactions are fraudulent, and we would be up here arguing that that finding is clear error, and we think that it was clear error. That's what I'd be more interested in personally. It sounds like what you just said was agreeing with me that, at least procedurally, had he simply said 100% of VDA, 25%, had he said those words, those would be findings of fact, wouldn't they? That's exactly right. Look, we know from White that that's what's required. At a bare minimum, the district court has to find facts, and if it had found those facts, we would be very comfortable up here saying that, as in United States v. Jones, which is cited in the reply brief, speculation from government witnesses regarding whether or not services were actually provided is insufficient. Is anybody else going to address this point, or should I press you on it? You can press me on it. This is only for my client. Okay, but same thing in terms of the total amount. I just want to get whether I have the bare numbers right. The category is 7 million to 20 million. The government comes in and, in effect, gets 18-plus million. So if that 25% were 15 or 10, you'd still be within that category, wouldn't you? I'd have to get a calculator up here to tell you about that. I think the numbers will, isn't it that the VDA is 2.9 million, which means 16 million has got to be from the non-VDA. That's correct. And, look, it's not our burden, respectfully, Your Honor. No, I understand. I'm just trying to see what's there. Their burden is showing. And, you know, if they had come up with a representative sample of the billing, it would be virtually unchallengeable on appeal. But they, out of nearly seven months of wiretap, they take one snippet that says, Oh, your pharmacy, one single pharmacy, you should turn a 25% profit. And then they, in a sleight of hand and a twist of logic, they say, Well, that means that Mr. Patel intended 25% of these transactions to be fraudulent. And there's simply no basis in law or logic for that conclusion. And for that reason, we'd ask for a reversal on that point. Thank you. Thank you. Mr. Gerwitz, you may proceed. Thank you very much. May it please the Court, Harold Gerwitz on behalf of Lokesh Teil. I'd like to thank the Court for accommodating my schedule this morning by this conference call. I have joined in Mr. Lorenz's argument concerning the Title III. My comments, however, will address the separate argument concerning Mr. Teil's participation in the alleged conspiracies. We've asked this Court to determine on de novo review that evidence Mr. Teil may have engaged in fraudulent practices or that he dispensed controlled substances in a manner not always consistent with the best pharmacy practices is not sufficient to establish that he knowingly and willfully acted to participate in Babu Hyatt Patel's conspiracies alleged in the indictment. Mr. Teil was charged in no substantive count of the indictment. During the relevant time periods, he worked as a pharmacist at only one pharmacy, the Grand River Pharmacy, where he was an employee and received only a paycheck. The heart of the government's evidence was its expansive Title III wiretap interceptions. There were over 10,000 interceptions from which the government chose those they played at trial. The government used this evidence to attempt to show Mr. Patel's control over the operations of the pharmacies. The very few of these that were offered as evidence of trial involving Mr. Teil were not evidence of his participation in the two alleged conspiracies. Evidence of their association is not enough. The government's arguments in their response brief rely on six specific pieces of evidence presented during the trial, the first of which is one of the very few, two, three, or four calls that were played involving Mr. Teil. This one was on July 6, 2011, and it discusses not the operations of Grand River Pharmacy, but comments by Mr. Teil on the closing of an adult care group home facility. It in no way concerned the operations of Grand River Pharmacy. The second concerns testimony by Mr. Gujarati, who was an administrative accounting assistant to Babu Hai Patel, about the return of medications. The government particularly referred to Exhibit 2F, which was a call and a conversation between Mr. Patel and Mr. Gujarati about the return of $40,000 in medications. According to Mr. Gujarati's testimony, however, the return never occurred. There was, in fact, a question from the jury at the conclusion of his testimony about this specific matter, and in response, Mr. Gujarati testified that he could not be sure that this or any of these returns in connection with Grand River Pharmacy ever happened. A third point in the evidence concerned a witness, Pinakin Patel, another pharmacist. The government cited his testimony to argue that Mr. Teil trained him in the legal practices which were described by the term pushing, but not dispensing medications. It was clear from his testimony, however, that he was providing that testimony concerning what he learned when he moved on after a period of about four months working at the Grand River Pharmacy and was working at another one, an entirely separate pharmacy, Highland Park Pharmacy. The fourth piece of evidence concerns a witness named Anish Babsar. The government has argued that it was his testimony that he saw Mr. Teil bill for prescriptions written by a Dr. Greenberg and that those were never dispensed. There was no evidence that he ever saw Teil pharmacy practices, however, because Mr. Babsar testified that what he saw occurred at a separate pharmacy, Care for You, where Mr. Teil was not employed and had no contact. The fifth of these points concerns a witness, R.P. Patel, who was an important witness for the government during the trial who testified about his employment as a pharmacy tech at the Grand River Pharmacy. He testified about what he claimed to have seen at the Grand River Pharmacy, but he testified about no communication or directions from Babarhai Patel to Mr. Teil at the Grand River Pharmacy. Finally, the government looks to the evidence and testimony related to an independent patient recruiter named LeVar Carter. His testimony established that he worked independently and worked directly with Vicks Company, referred to as VDA, or Visiting Doctors of America. He provided no testimony, however, that Mr. Teil ever accepted prescriptions that Mr. Carter was responsible for bringing in or any money from Mr. Carter in any way in coordination with Mr. Babarhai Patel. There was substantial evidence in the trial concerning the discrepancies between what he described, the actual documents, the prescriptions, and the records of the pharmacy. Counsel, this is Judge Boggs. Your time's about expired. I heard you start out by saying six instances. Did you get through all six or were you only up to number five? No, I got through all six, Your Honor, and I was just about to conclude. I am at my conclusion. Okay. Go conclude. Thank you. In conclusion, Your Honor, without connection of Mr. Lokesh Teil to the evidence of the overall conspiracy, there was insufficient evidence on which he should have been found guilty or his case should have been presented to the jury. For those reasons, I would ask on his behalf that this court reverse. Thank you. You'll have your two minutes for rebuttal. Good morning, Judge Boggs, Judge Sachs, Judge Cole. Frank Simmons on behalf of Verrill Thacker. The cases before the court, as I said in my brief, we do join in with the Title III motion. We would like to spend our time this morning speaking on behalf of Mr. Thacker before this court on pretty much the same cause as Mr. Gerwitz indicated, which would be the insufficiency of the evidence against my client. I would ask this court to review that and reverse. I have possibly seven points that I would like to bring to the court's attention that the government used against Mr. Thacker, and given the time that's allotted, I would like to start. The first point would be the VDA prescriptions that were filled by my client. He was working at the Glendale Pharmacy for approximately seven months. His first two months from September to October of 2010 filled 225 prescriptions. This actual filling of prescriptions was done before the government's main witness against him was even employed at that pharmacy. There's also a video, is there not? Yes, Judge, there is. I'm going to get to that video. Okay, that's on your list. Go ahead. Yes, this is my third point. The second point I would like to bring to the court's attention is that in November of 2010, Mr. Thacker was videotaped again, audio taped, videotaped, with a meeting with the primary defendant. At that particular time, law enforcement did not even know who my client was. They had no idea what his name was. They had no idea who he was. At that time, he was actually stopped leaving the restaurant. There was a meeting at a restaurant. He was stopped. At that time, the police actually took his license to see who he was. As late as, again, November 3rd, 2010, that is approximately a month after the filling of the BDA prescriptions. The third point I'd like... Why is that helpful to you? If somebody is in fact involved in a conspiracy, the fact that you don't know his name at a given point, how does that help you? Well, Judge, it helps us because the government's point, and the point where I believe he was actually convicted, was that he was part of the conspiracy from the beginning, which would have been prior to September when he was filling the BDA scripts. If the government didn't know who he was at that particular time, or had no calls between him and anybody in the conspiracy, why would he be a main player? I believe the conspiracy conviction came from the BDA scripts. That's why, when we move to our third point, there was a second CS, a confidential informant. His name was Aliq Ali. This is what Judge Stotts was speaking of, the videotape. At this particular time, the videotape shows that two undercover officers come into the Glendale Pharmacy, where my client is working. You can see the film, you can see the CS. And if you do a transcript, if you read the transcript of the conversation, he was asking my client questions, several questions of which my client answered no. One of those questions was, part of the conspiracy was to fill prescriptions without patients there. And in that video, the confidential informant asked Mr. Thacker, he had 100 prescriptions in the car. Now, all of this is being videotaped. The whole point is to get Mr. Thacker to act out. He asked Mr. Thacker, would you fill those scripts? And Mr. Thacker said, no, it can't be done. Several points in time, Mr. Thacker refused to follow instructions that would lead to believe that he wasn't as part and parcel of this conspiracy as the government had us to believe. Are you saying that some of the times he wasn't doing bad things, even if he was doing bad things other times? Well, Judge, that has been asked before. And the bottom line was the CI, if you look at that particular script, which I believe was part of the transcript that we submitted, you can see him also talking to the officers, saying he doesn't know a lot of these things. He's trying to get him to do something that he's not doing. And the officers are actually wondering, why isn't he filling these scripts? It didn't go as planned. And I think part of that is because Mr. Thacker wasn't as involved or he was not as plugged in as we would have. Because to convict him of the conspiracy, he doesn't have to be a major player, which you were denying earlier. He doesn't have to be as connected as something else. He just has to be connected. That is correct, Judge, but in several instances, not only that instance, but in an instance afterwards, in January of 2011, a marketer that was supposedly part and parcel of the program, and there was no evidence that he actually worked with this marketer, Leotis Ellis. Sorry, was the word marketer? Marketer. Marketer, got it. Thank you, sir. Do you want to wrap up? Any other additional? There was an instance, again, the whole transcript has inferences or instances where you have Mr. Thacker saying on recorded tape, no, no, this can't be done. No, no, we won't do this. No, no, we can't do this. Okay, we get the point. Thank you, sir. You'll have your minute for rebuttal. Thank you. May it please the court, Bruce Rogo for Kamal Achaya. Sometimes a jury gets it wrong, and this is such a case. There is not sufficient evidence in this case to prove that Kamal Achaya had knowledge of the scheme, and knowledge of the scheme is a sine qua non for convicting someone of conspiracy. The case is built on inferences upon inferences. Indeed, the trial court even said to the trial lawyer, you may be very right. The inferences are not strong, but he sent the case to the jury, and he said this is a very close case. So you start really with the recognition from the trial court who heard the seven weeks of testimony that this was not a strong case against Kamal Achaya, and then you take a look at the evidence in the case. The government very candidly in its brief at page 40 conceded that no co-conspirator testified that Kamal Achaya had knowledge of the scheme. The lead case agent, Mr. Parkinson, at page 6741 of the record, pressed about whether or not there was any direct evidence or indirect evidence, and basically he, at one point, and I've got the colloquy in my brief, he basically didn't respond. Because there really wasn't anything. It was built upon inferences upon inferences. Did some of the wiretap interceptions involve phone calls between Mr. Patel and your client, and arguably implicated your client in the conspiracy? There's one Judge Cole that's the key that the government says is the best evidence in the case, and it was when Chirag Soni, who had some medicines in his apartment, it had not been broken into, actually the government had staged what looked like a robbery of that, and then Mr. Patel talked to my client, Kamal Achaya, and it's from that conversation, and it's really only one sentence in it, where she asks, legally, you can't do anything, can you? And it's interesting, because the conversation is translated from Guarachi, which is the language that they were speaking, but in any event, the punctuation is interesting. But it is a question. It's not a statement. She's not saying, this is illegal, you can't do anything about it. But didn't she go on and say, since only he knew about it, it was from his store, wasn't it? How would she know about his knowledge if she were not aware of the conspiracy? Well, she knew that he knew that it was medicine from his store, but that's all that's saying. It doesn't say anything about the conspiracy, that this is billed but not dispensed medicine, and part of the conspiracy. I mean, when you read the whole conversation, there's really nothing there, and at the end, I think, as I recall the conversation, they just simply say, good night. But if that snippet is all that they have, and that's their best evidence, then that is not enough. What about her role as, I guess, officer or straw person in these different corporations and different accounts? The testimony is clear that Mr. Patel is the one that opened the accounts. In fact, I have, at page 6 and 7 of my reply brief, gone through every one of these issues. One of the things the government said, and this is your question, Judge Boggs, Archaya acted as nominee owner for Patel Pharmacy. Gujarati testified that Patel signed the corporate documents. She was never a signator on the account. Page 6 and 7, I have taken each one of the government's pieces of evidence and did the per contra to them to show that they do not show any knowledge of the conspiracy. Without knowledge of the conspiracy, she could not be a co-conspirator, and she was just convicted on the one count. That's all she was charged with. The argument is that, correct me if I'm wrong, that part of the inference is that all of these corporations and accounts were things that were useful in moving or concealing or facilitating the money, and the argument is that she simply did this for her friend or whatever, without knowledge of where the money was coming from? Well, she didn't even really do it, because Patel controlled it all. In fact, the testimony was, Patel controlled the whole thing. Patel has been controlling and being involved. Obviously, he controlled it because he's the source of the money. But there's no testimony, no evidence, that she had knowledge of the whole purpose of any of these things. It was to be engaged in a Medicare fraud scheme. I mean, that's really the bottom line of all this. So from her point of view, your position is that all of this money and accounts was all coming from legitimate business? First of all, she had no indication that it was coming from illegitimate business, and there's no evidence that she knew it was coming from some business that was part of the Medicare scheme or fraud. And we talk about all this money. She wasn't signing the checks. There was one check, $160,000, that went through her account, but Garagi testified that Patel put it in the account and took it back out for someone else, and Archaya had no knowledge of the details. I mean, this is their star witness, no knowledge of the details. Pages 79, 58, 79, 59 of the transcript. Thank you, counsel. My colleagues have other questions. You'll have your minute for rebuttal. Okay, we'll hear from the attellee. May it please the Court, Wayne F. Pratt, appearing on behalf of the United States. In discussing the wiretap issue, I hate to use that word necessity, but it's such a convenient shorthand term that everyone uses it. It actually is, of course, the requirement of a full and complete statement as to whether other investigative procedures have been tried and failed or reasonably appear unlikely to succeed. Appellants concede in their brief that the full and complete statements in this case were not simply boilerplate that would be applicable to every case, but in fact there were specific facts that related to this particular case. Also, that the government did not simply in the first application put forth reasons we needed the wiretap, reasons the other techniques would not be fully effective, and then stand pat on that in each of the seven applications. There were changes, there were additions to the point where we came to the seventh and final application. It was a 30-page discussion of a full and complete disclosure of the other investigative procedures. And so, as the Court referenced, there were things like unsuccessful trash pulls. The government was caught, and then guess what? On trash day, there's no more trash anymore from that particular target. And so, it really feeds into a question of whether it was appropriate to have the goal of dismantling the full extent of this enterprise, and that was the goal. The goal wasn't to have... Your opposing counsel suggests that it's that the wiretaps were perhaps not necessary because common techniques had not reached their fruition, that you could have... If there was an argument about the clients that were coming in, then the thing that the government should have done is provided clients of other races. And instead of doing that, the argument is that you improperly turned to a wiretap. How do you respond? Well, I respond to that by twofold. First of all, the actual quote on the wiretap call was, it's as if detectives have come. And so, when Bhabhabhai Patel is telling our informant, I think you brought some detectives, it's not clear to the government that the great thing to do is introduce some other folks, even if they're a different race. There may be some suspicion here that the fellow who brought us detectives today, he may bring some people of a different race, but there may still be some lack of trust there. The other broader aspect is that the government, and this is a dispute we have in the defense, the overall goal here was to learn the full extent of the alleged enterprise. It wasn't to pick off Bhabhabhai Patel or pick off the one particular pharmacist that they did the undercover operation. The defendant, Bhabhabhai Patel, controlled 26 pharmacies. The initial indictment of 26 defendants resulted in the indictment of 12 pharmacists and 4 doctors. There was an additional 13 defendants later indicted, which included, I believe, 6 more doctors and a number of pharmacists. So, fundamentally, there's not a suggestion that you can go undercover one by one and take off the entire enterprise. In that sense, it's no different than a traditional large-scale narcotics organization. The fact that you may be able to make a low-level buy from one particular individual or one particular location doesn't mean that in order to learn the full extent of the enterprise, you don't need to use a wiretap. Defense counsel indicates that there's something wrong about trying to learn the full extent of the alleged enterprise, and the government just disagrees with that. Perhaps his objection was that when you're on the seventh run, you're still saying the same thing. We're just beginning to tap into the full extent of this massive conspiracy. How do you respond to that, that you're on number seven after quite some time of wiretapping and the allegations to the court are still, well, we're just beginning? I don't think the fact of the 30 pages of the explanation of what we tried was really that we were just beginning. I think the court, and of course this court has to give deference to the court's determination that we still have progress to be made. There were some calls even as late as July of 2011, which was the last wiretap, which were new calls which were introduced at trial. And so you've got that aspect. And I think the more fundamental response really is if the defendants had really, if Bhabhabhai Patel in particular had wanted a shorter wiretap, he probably shouldn't have had such a far-flung organization that took that long. Well, that's not much of an argument. He didn't know he was doing a wiretap. I know. That's himself. What, in, is there, we didn't press the other side except sort of inferentially about each separate wiretap. Are there things, let's say, from the sixth or seventh wiretap that are crucial in these convictions? I mean, I was trying to think about what would we do if we were to say, okay, they should have suppressed the seventh wiretap or the sixth wiretap. You know, where would we end up with that? I think we'd end up with some kind of remand for a determination of what was in and what was out. I think, generally speaking, we're not. You have the whole transcript.  Probably, Your Honor. But I do think that the fact is that the government clearly laid out, as to each of the seven applications, how things had developed and changed. The court, at any time, could have said, you know, I'm getting your summaries. Each affidavit had a full explanation of what we learned in the previous 30 days. And so if the court had said, you know, you seem to know everything about everybody, the court could have said, no, the court didn't. We were obviously learning new things. Also, the later applications, in effect, talked about what had been found from the earlier ones. I suppose that could cut both ways. It would both give you additional probable cause for what you needed, but would also have shown that the previous techniques had already worked. Although the wiretap was clearly working in terms of telling us the entire scope of the conspiracy, the Ninth Circuit case that the defendant relies upon is that the government can't manufacture necessity. And that's the quote from the case. And this case does not provide any basis for this court to say that the government manufactured necessity. The fact is, when you're dealing with 22-plus pharmacies and all of these different defendants, it's going to take a while to learn the roles and learn the identities and learn how everyone acts. I want to talk about the non-agent interpreters in the Lopez case from the First Circuit. I am particularly hopeful that this court would not adopt and perhaps even reject that dictum in the Lopez case, because the Lopez court didn't reverse for not immediately informing the court that the government was going to use interpreters. The fact is, the wiretap statute has a very explicit list in 18 U.S.C. 2518 of items that are required in applications and orders. It's very explicit, a full and complete statement of the facts and circumstances, a full and complete statement as to whether other investigative procedures have been tried, which we've already discussed, a full and complete statement of facts concerning previous applications. They've got this whole list in the statute of things that the government has to include in these applications and orders. It does not include, oh, and by the way, we expect to have some foreign language calls, and we're going to, in fact, use an interpreter. And for the First Circuit to say that this is a mandatory requirement in all instances, I think it's pretty unfortunate. I think that the fact is, in this case, the government referenced the use of the interpreters in the very first 10-day report. There was clearly no effort to hide that from the court, but to say as an absolute requirement that in every application where you think you're going to get some foreign language calls, it's a mandatory requirement, that's simply not in the statute. Was the important thing that the court be informed that these translators would be monitoring and minimizing as opposed to a law enforcement person doing that? Is that the information that might have been needed by the court? Well, and that's the concern because every person who monitors, and there was testimony about this by Agent Parkinson at the hearing of June 14, 2012. It's our number, record number 895. He testified that everyone that monitored had to go through a minimization process. They had to read the affidavit. They had to talk to an assistant United States attorney who explained the minimization process to them, and that's the same thing that's done whether you have a foreign language monitor or whether you have a DEA agent or whether you have a contract employee. Counsel, the statute says that you can use contractors, right? Yes. And you say, well, a translator is a contractor, which they are. Do you routinely or not inform the court that contractors at all would be used? That is, is this a fight about translators or is it a fight about, in truth, telling them that you're going to use contractors at all? Well, I think legally under the statute it's the same question. The statute doesn't require us to tell the court whether we're going to exercise the right to use contractors, which clearly it's anticipated, and the legislative history says sometimes agents have to go out and do agent work and that if you're just going to have someone who's going to sit with headphones on and listen to calls, you can use contractors even if they're in English. And it's not clear to me, given that the statute says the government can use contractors, not clear to me why there should be any particular notice to the court given that the real question is, are they appropriately minimized? Are they appropriately instructed? And the testimony in this record really, which is the case agent, and there's no contrary evidence, was that these contractors were informed, told to minimize, they went through the process, and, of course, that really leads into the question. Really leads into the more important question. More important question. What's the claim that there was access to privileged calls by not just the TINK team but by others? How do you respond to that? Well, my response to that is that, again, and I encourage the court, if you have a concern, to read the testimony of Agent Parkinson. He explained we had a separate TINK team. While it's true it went in the same mechanical system, I think from his testimony you get the sense that that's an artifact of the system, that they can't suddenly say we're going to separate calls electronically. He made clear that there were separate monitors. They were, while they went into the same master system, they went on a separate disk. They were reviewed by a TANE attorney to see if they fell within the crime-fraud exception for attorney-client privileges. And none of those calls, I haven't heard a single one of those calls, okay, after the TATE team went in place. Just to be clear on this point, what can you tell us about this notion of does being on the system in fact mean that if Agent Y, who had access to the system, was willing to violate whatever rules there were, could he have just decided to go in and listen to those calls, or were there some barriers in place? I know the part about the separate disks, when they were taken off on the disks, was they still on the system? To answer my question, in fact, if Rogue Agent X had wanted to listen to it, could he have listened to that call just as well as he could listen to any other call? We're talking about technical areas, but I believe that Rogue Agent X could have. It's not clear to me that the system could have been set up any differently, but it seems to me when they're claiming error on appeal, it seems to me it's their burden, when they have the case agent or whoever else they want to call on the witness stand, to establish that it actually happened. To say that hypothetically their rights might have been violated, really I don't think establishes a basis for reversal in this court. The testimony is that the actual calls were segregated, that the case agents, after the take team was in place, did not access those. I suppose in their best case scenario, they could say, oh, those folks were lying, they were sneaking in there at midnight and accessing them. But the fact is, we have to deal with the record we have. And in the record we have, there was a take team put in place, there were separate monitors, there were separate agents, there was a separate assistant United States attorney, and none of the factual development in the record says that there was any kind of violations of the defendant's attorney-client privilege. And that's ultimately what it comes down to. It really is not an alleged wiretap violation. So it was clear that the case agents got material that had been appropriately monitored and redacted. Exactly. The question of whether they could have done it some other way is what's open with really no evidence. Exactly. Exactly, Your Honor. And so the question is, you know, counsel for a defendant, Rababai Patel, he's got all those calls. They were given separately, they were placed on a disk. He's got all those calls. He could have done whatever in the district court to establish improper access, to establish prejudice. He didn't do that. The record is silent on that. In principle, if he could have said that X piece of information that the government has could only have come by knowing this particular call. Exactly, Your Honor. None of those calls were used at trial. No, none of those calls were used at trial. And so just briefly, Your Honor, in terms of minimization, the fact is the contract interpreters, we finally got to the corrective statistics, 11.5% of the calls 60 seconds or longer were minimized. Agent Parkinson explained as to the arguments the defense were making about we shouldn't have listened to asset-related calls, but we were investigating Monday laundering. We shouldn't have listened to a personal call, but we had an example of how that turned to crime, and that was actually introduced at trial. Family calls, we had assets being placed in his minor son's account. And so the minimization, I believe, the government correctly, the district court rather correctly found that there was adequate minimization in this case. Does the court have any other questions regarding the wiretap? No, I don't, but I would like to have you address the sufficiency of the evidence and maybe initially Kamal Acharya, because that seems to be a very close case. And I wonder what your response is to the questions that have been asked in terms of the nominee ownership of properties and these accounts and how they would connect to the conviction for conspiracy to commit health fraud, the one account that she was talking about. Well, yes, Your Honor, and I would like to say, I mean, the reference both in the government's briefing from the district court, the fact is stated as a close question. The fact is the trial court denied the Rule 29 and denied the post-verdict motion. So there is such a thing as being a reasonably close question, and still this comes down on the other side of the line, and that's what the government believes is the case. When the proceeds of the fraud, and that's what these build but not dispense drugs were, there were $500,000 worth of drugs in boxes, which were stored in two locations. One location was the Chirag Soni's apartment, and the other location was the apartment of Kamal Acharya, the defendant. The government did a late notice search warrant and made it look like a burglary so that Mr. Soni's drugs had been stolen. That's $500,000 of medicine. And it's interesting because the conversation with Kamal Acharya that they talked about, Babubhai Patel did not say, I'm calling the cops, Livonia Police Department, he said, I'm using the private investigator. And it's in response to using the private detective that she makes the response, because it's medicine, legally you can't do anything about it, right? It directly follows. And so I hear the argument that we're piling inference on inference. It's not an inference on inference. That's one inference. One inference is when I find out that a friend of mine has just had a $500,000 item stolen, and they're not going to the police. They're only using private investigators. And she says, well, legally you can't do anything about it. Is that the inference because she has the same kind of boxes in her apartment also, isn't it? Yes, Your Honor. And so she understands what's going on here. It's a direct inference that we ask the jury to draw. Most of us, if a friend of ours had an extremely valuable item, a $500,000 item stolen from their house, I don't care if it's a painting or jewelry or whatever, you know, and they said we're doing private investigator, most of us would go, yeah, well, what are the cops, what are the police saying? It's a very clear common-sense inference that we ask the jury to draw. It's like she's not asking what the cops are doing. She's going, yeah, legally you can't do anything. Legally you can't do it because the stuff is, in fact, illegal. Yes, that's the inference. If there's no law that says you can't investigate medicine, then that's the inference you want. Exactly, Your Honor. And that was one that was discussed with the jury, and it's one that they chose to draw in this case in convicting her. And the fact is we're on the Jackson versus Virginia standard, right? We are, Your Honor. It has to be no reasonable jury could have drawn that inference and made that argument. And the fact is after this supposed theft and after the conversation, she continued to store the drugs, the boxes of drugs, in her apartment for another two months. The search warrant, the conversation was April 28th and April 29th of 2011. It was June of 2011 that the government actually introduced photographs of other defendants carrying the boxes out of her apartment to be stored someplace else. So she not only had the knowledge and had these conversations, she continued to have her share of the boxes stored for a couple of months afterwards. How did the nominee ownership fit into this? Why does that indicate that she was more than a girlfriend who let her boyfriend put her name on the legal documents? Well, Your Honor, I think she understands. She had a particular call with Defendant Babu-I-Patel where she was complaining about the fact, you put my name on all of these, you just open businesses in my name, but you don't take me in them, you exclude them. And she's talking about, yeah, there's going to be $18 million in these businesses, but you're not letting me in. There was another instance where she talked with one of the pharmacists and she had to get all the information about these because she needed to talk to the insurance company. Blue Cross wanted to talk to the owner and she goes, you know, I need the information so I can talk to them. So she's in the defense side, they argued, oh, well, Babu-I-Patel sometimes signed her name on corporate documents, so she didn't know anything about it. Well, she had very clear conversations that she knew not only that she knew she was a nominee owner, but she knew that these businesses were very profitable. And then there was a particular call where she discussed using the recruiters and paying for business. And they were, you know, the defense tried to a trial and they tried on appeal to say, well, they were joking around that she was going to become a recruiter and get pharmacy business for him and earn, I think, $4,000 a month if she could bring in 200 patients. Yeah, she didn't do that. The evidence showed that she had already brought, like, some small number. I think so, I think so. But that really wasn't, and here's the thing, that was not her role in the conspiracy. There were others who did that. But remember, the argument here is not that she didn't do plain to make her part of the conspiracy. The argument is that she doesn't have knowledge. She knows, in fact, that this is how he operates and gets business, and that's illegal. Getting kickbacks for patients, that's alleged in the indictment. You know, that's at page 14 to 15 of the indictment. That's page ID 4582 to 4583. Specifically alleges that that's part of the fraud conspiracy that's being charged here, that people, that he pays kickbacks in order to get more customers to his pharmacies. And she's got a direct conversation with him where she's laughing around about, yeah, maybe I could do that too. So I think that the evidence, I mean, really the question is, how much do you have to do before the jury instruction? It's a standard jury instruction which says it is reasonable to infer, and we are talking about inferences, but we tell our juries, it's reasonable to infer that a person intends the natural and probable consequences of their actions. And the jury was entitled to reasonably infer that if you pose as a nominee owner, you get the information so that you can talk to the insurance company, you store the boxes of medicine in your apartment even after you know there's been this theft, and you're going, oh, well, whose store were they from? And that quote, the reference, whose store are they from, meaning that was the person they were suspecting of stealing it, a particular pharmacist, Mahulio Patel, were they from his store? And he said no. Do you want to hear more about the other? Okay. Because I'd like you to go on to the amount of loss. All right. Your Honor, I think as to the amount of loss for Balabai Patel, we have two issues. First of all, the question was did the court rule on a disputed matter? It seems to me that what distinguishes White from Simmons is whether what this court has before it is enough to allow meaningful review. If the court just picks a number from a pre-sentence report and says 19 million, this court doesn't really have a way to review that other than the pre-sentence report said 19 million and the district court said yes. Here, the court has a basis for meaningful review. The meaningful review is 100% of the Visiting Doctors of America, VDA fraud, and 25% of the rest. And by the court to the- How did the government reach the 25% of the rest figure other than to say, well, this is a conservative estimate, that's good enough? Well, I think there are two things. First of all, it was very clear not only from a wiretap call, but it was also then followed up by testimony of Balabai Patel on several occasions that I expect to make 25% profit or it's just not worth it to open these places. And the second aspect of that was- I think some of that profit had been from legitimate sale of pharmacy products and prescriptions. Not the profit. And that's where the government established that by and large, he even said himself, he said if you don't do the zigzag, if you don't do the corrupt way, you not only don't make money, you lose money. We had the testimony where we had the description of, well, when we say a pharmacy, what are we talking about? And we had testimony, for example, about one of the pharmacies. It would be about half the size of the jury box. They put these in a doctor's office that they were paying inflated rent to. The chances that this pharmacy was going to make any money, you know, that people are going to come pouring in off the street and go to this pharmacy, really was something that the witnesses who talked about that said no and which the court accepted. They're just not profitable pharmacies when you rent 10 by 12 foot space from a doctor and say now we have a pharmacy. And so these pharmacies, if you accept the proposition that they weren't profitable, period, you could have some legitimate medications and still not be profitable. If the only way you can make them profitable is to engage in this massive fraud and your profit is 25 percent, then it's reasonable to go with a 25 percent number. The total billings from Medicare, Medicaid, and Blue Cross were about 67 million over the relevant time period. That's the way you get to something like 16 million out of the non-VDA plus 2.9 out of the VDA. Yes. And understanding that we only have to get 7 million in order to uphold the district court, the fact is that it's pretty conservative if you end up saying it ends up being almost closer to 10 percent. I know we've got the 2.9 million VDA. Is there any reason that you didn't try to do some sampling? That is, to get that 66 million figure, you've got to presumably know what the billings were that came in, let's say, to Medicare or to Blue Cross as to why you couldn't have taken a sample of those billings and then looked at what they were. One of the difficult things, and this came up in the second trial, one of the doctors that he had bribed to do it, you have the doctor who writes, she was a podiatrist who wrote like 16 prescriptions per patient. Not all of them were filled. It's actually very difficult to go through an audit. It's like, okay, we've got a patient file. She wrote 16 prescriptions. How many of these are legitimate? How many of these are illegitimate? They're being paid for with bribes, and so the Medicare system won't pay for anything that's the result. So your argument is that even if it was medically legitimate and actually dispensed, if the doctor was taking kickbacks, then Medicare shouldn't have paid anything for it. And so you also have this false thing where it's all about medical necessity. I mean, it really isn't. The fact is, Bhabhabhai Patel's method in this whole operation was to spread the money around to pay the bribes and kickbacks in order to get the business to his pharmacy, and that's the basis on which really $7 million out of $67 million is a conservative number. I guess I'm struggling a little bit with why at the sentencing hearing when Mr. Patel contested your percentages, the amount of the loss, the government put on no evidence at all. Am I correct about that and just relied on the trial transcript? We had the trial transcript, and I also would indicate that the defense also put forth no sort of alternative calculation or suggestion. I mean, their position at sentencing was they wasn't guilty. And so we had trial testimony about these pharmacies not being profitable without the corruption and fraud. And if you accept that they weren't profitable without the corruption and fraud, then the 25% figure is very conservative. Counsel, are there any matters that the other judges wish to go into? Okay, thank you. Thank you. All right, we have time for rebuttal in sequence. Mr. Loren? Thank you, sir. With respect to the use of unsworn non-law enforcement personnel to conduct the monitoring, the statute specifically requires in Section 2518.4 that the application identify the agency which is authorized to conduct the interception. The first order in this case specifically authorized special agents of the DEA to execute its provisions. The information that Judge Torrella in Lopez kind of spoke in shorthand as a duty of candor to the court is not something that Judge Torrella made up out of the whole cloth. It's found in the language of the statute, and it's essential to effective supervision by the court. Counsel, if Lopez is right, should they not be required to put in that they're going to use any contractors at all, not just translators? Yes, sir. Okay. Because that allows the judge to determine how and by whom. In addition to the statute you read, and I had not read it before, it says identify the agency, not the agents, right? That's true, but the statute contemplates that it is an agency that the agents or the nature of the monitors is to be spelled out in the order. And in this case, the order is specifically identified not persons working under the supervision of So you think agency means not just that I say I'm GSA, but I am Joe's heating company working for GSA? Well, I'm not sure it has to specify the name of the company that the contractor is employed by, but I think that a judge who is doing his or her job of supervising and authoring a wiretap should be informed, and the statute requires they be informed, how to judge the monitoring and minimization efforts. Okay. We get the point. Anything else? Thank you. And require supervision, I'm sorry. Okay. Take your best shot. I can barely see my name in one minute, Judge. That's your problem. Your Honor, several points. First, the issue is not whether or not they use these communications, attorney-client communications at trial. The government is far too clever to use these at trial. The issue is whether they obtained evidence through attorney-client privileged communications. That's unclear. When you had the hearing, wasn't the burden yours to come forward with evidence that shows that there was a problem with minimization, and I don't think there was cross-examination, but no witnesses were put on by you at that hearing. That's correct, but we did elicit testimony from Mr. Parkinson that shows that they violated the authorization order, which said special attention shall be given to minimize all privileged communications. Not only were they not minimized, 0% were minimized, they were entirely recorded. All of them were recorded. Now, with respect to the tank team, this court has in the in-ray grand jury subpoenas, which is cited at page four of the reply brief. It's expressed serious concerns about the use of tank teams in general, and here the tank teams were in the very same room as the agents who were investigating the case. It's like in-ray grand jury subpoenas on steroids, right? One quick point on the loss amount. Now, we didn't have to put on any evidence at the trial or at the sentencing hearing, and in addition to that, we did, though, have our own loss amount calculation. It's not correct what the government said there. We said the evidence that was seized from the amount of evidence that seized pharmaceuticals, that's the only reliable evidence we have with respect to the loss amount. What was that amount? I think it was approximately $500,000 of seized evidence. So that was our figure, and that was supported by the evidence. The stored evidence in the apartment? That's right. That's right. Thank you. Yes, if I may, Your Honor, I'd just like to add that the argument that I have presented earlier concerning insufficient evidence to show that Mr. Teil was a member of the conspiracy alleged in the indictment is the argument which I made to the district court in the defendant's motion for judgment of acquittal, beginning at page ID number 3084. Those are pretty much the same arguments that you just gave to us. Is that right? That's right. An argument based upon variance in citing the Supreme Court case of the United States v. Kodiakos. Okay. Anything else? No, Your Honor. Thank you. Thank you. Mr. Simmons, I think you're next. Just briefly, the government made reference to Kamala Chari as far as knowledge and disdain. I feel that same standard reaches to Bureau Thacker. Not only do you have to show some knowledge, but you have to show knowledge of the conspiracy and agree to engage in the conspiracy. Now, the government says that, well, a person intends its actions. When they make an action, they intend that. But if you look again through the transcripts of any conversations, there's only six out of 11,000 which involve my client. Most of the time, you'll see him not agreeing with, and this is verbalized, not agreeing with what was part and parcel of the conspiracy. So I ask the courts to take that into consideration. Thank you. Okay. Thank you. Mr. Rogal? I think I have two minutes that I saved. So let me, in those two minutes, very quickly. Tyler Parkinson, the agent, he says he does not recall in the 11,000 telephone conversations a single piece of evidence that ever said Kamala Chari assisted in falsifying any records. Parkinson, the agent, at page 7625, acknowledged that Archaya's signature on some corporate documents was not the same as her driver's license. Her name does not appear on a single one of those bank accounts. I've laid all of this out in the brief. Is there anything in the conversation between Gujarati and Patel that was recorded that suggests that Kamala has been filled in on this grand conspiracy about dispensing? Excuse me, I keep saying that billing without dispensing for fraud, the answer is no. There is the slimmest kind of argument here. This is all inference. Yes, she had a conversation. Yes, she talked to an insurance agent. Nothing illegal about that. What about the theft and the boxes that she kept in her apartment? There was nothing, in fact, at 9341, 9342, it's stipulated there's nothing illegal about keeping medicines in your apartment. We know that. But if you're keeping them for the purpose of there being BND drugs that are part of the conspiracy, then you'd have to show that she knew that that was why they were there. And that's what the government says, that the theft of the comparable matter, which is not being dealt with in a, let's say, above-board fashion because she knows that they can't because they're illegal. I mean, that's the closing argument to the jury. They say that's their best evidence. The question is, under Jackson, could a reasonable juror believe that? Any reasonable juror. Maybe 99 percent wouldn't, but... The answer is no because it requires an inference. It requires you to think from that question, that she had knowledge of the specific conspiracy and agreed to participate in the conspiracy. How do you respond to the argument that she had a conversation with Mr. Patel that indicated she knew patients were paid to come to the pharmacy? In fact, when you look at it, I have the indictment set forth. It is not a marketing indictment. I think it's at page three of my initial brief where I have the whole indictment and the scope of the indictment, and also I've set out the fact that Parkinson agrees that she never had anything to do with marketing. There was no marketing. The fact that she knows that people are being paid to bring prescriptions to the pharmacy and that she could be paid to bring patients to the pharmacy, doesn't that indicate that she knows that people who are not ordinary and legal prescription buyers are being brought by paid individuals to the pharmacy to buy pharmaceuticals? Why doesn't that indicate? Give me your best argument for why that's not pretty damaging evidence. It is not damaging evidence because there is nothing in that conversation that reflects the fact that she knows that something illegal is being done with regard to that. In fact, I think everybody agrees it was a, quote, joking kind of conversation, and Parkinson agrees that there was never any marketing that she did. She was never paid for any marketing. There's no evidence at all that she participated in any marketing. And so when you're talking about the indictment... I'm sorry, I'm just trying to understand. You can assume that she knows people are paid to go by to take a prescription and get drugs and that it is an improper inference that that is knowledge of an illegality. Well, first of all, I'm not agreeing that she knows that that is happening. I don't think there is evidence that shows that that's happening. And the indictment does not talk about marketing because there's no question that marketing does constitute or can constitute a Medicare violation. But if you look at page 5 of my brief where I talk about the scope of the indictment, it does not talk about marketing false and fraudulent claims, soliciting and receiving kickbacks and bribes for arranging the furnishing of services. That's a good point. Anything from my colleagues? Thank you. I appreciate the arguments by each and every one of you. And Mr. Simmons, we especially appreciate your taking this under the Criminal Justice Act. It's a service to our system of justice. The case will be submitted and the clerk may call the next case.